IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
Ft. Lauderdale Division

| | | |
|---|---|---|
| HARVEY J. KESNER | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. _____ |
| | ) | |
| | ) | **TRIAL BY JURY** |
| BARRON'S, INC. | ) | **IS DEMANDED** |
| WILLIAM "BILL" ALPERT | ) | |
| | ) | |
| -and- | ) | |
| | ) | |
| TERI BUHL | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

# <u>COMPLAINT</u>

Plaintiff, Harvey J. Kesner ("Kesner" or "Plaintiff"), by counsel, pursuant to Rule 3 of the Federal Rules of Civil Procedure, files the following Complaint against Defendants, Barron's, Inc. ("Barrons"), William "Bill" Alpert ("Alpert"), and Teri Buhl ("Buhl"), jointly and severally.

Plaintiff seeks (a) compensatory damages and punitive damages in a sum not less than **$25,000,000.00**, (b) prejudgment interest on the principal sum awarded by the Jury from October 4, 2018 to the date of Judgment at the rate of 6.75 percent per year, (c) reasonable attorney's fees, and (d) costs – arising out of the Defendants' defamation, commercial disparagement, deceptive acts and unfair practices in trade or commerce, and tortious interference with contract and business expectancies.

## I.  INTRODUCTION

1.      This is a case about a media hit piece that destroyed the 36-year, untarnished career of a successful corporate and securities attorney.

2.      On October 4, 2018, Barrons published a bombshell online article that prominently displayed the following false and defamatory headline:

MARKETS    FEATURE

# The Lawyer at the Center of SEC Pump-and-Dump Case

By Bill Alpert    October 4, 2018

[https://www.barrons.com/articles/the-lawyer-at-the-center-of-sec-pump-and-dump-case-1538675403 (the "Barrons Article")].

3.      The "Lawyer" targeted in the Barrons Article is Kesner.

4.      The defamatory gist of the Barrons Article is that Kesner is involved in securities fraud.  Directly and by implication, Barrons and Alpert accused Kesner of being at the "Center" of a multi-year "pump-and-dump" scheme involving 3 companies and 20 defendants.  Barrons and Alpert falsely accused Kesner of failing in his "gatekeeper" role as a securities lawyer to "protect the investing public".[1]

5.      The qualities disparaged by Barrons and Alpert – Kesner's veracity, honesty, integrity, ethics and performance as a securities attorney – are peculiarly valuable to Kesner and are absolutely necessary in the practice and profession of any securities lawyer.  The Barrons Article ascribes to Kesner conduct, characteristics and

_____

[1]      The Barrons Article also falsely represents that Kesner was "terminated" from the Dallas law firm, Haynes and Boone.

2

conditions that would adversely affect his fitness to represent clients and to conduct the business of a securities attorney.  Barrons and Alpert's false and defamatory statements injured Kesner in his business and profession as a securities attorney, causing Kesner to lose clients, lose standing in his profession, suffer a permanent disruption in his successful practice, and experience a high degree of pain, mental suffering and distress.

6.     Barrons and Alpert acted with actual malice and reckless disregard for the truth.  They knew from reading the complaint filed in the "SEC Pump-and-Dump Case" that Kesner was not involved in the securities fraud alleged to have been committed.  In spite of their actual knowledge, Barrons and Alpert published a story that accused Kesner of being at the very "Center" of the pump-and-dump.

7.     In addition to the millions who viewed the Barrons Article on www.barrons.com, the Barrons Article was a featured story on Apple News, where it was republished to tens of millions more.  Alpert also tweeted (republished) the Barrons Article to a new target audience – his 870 Twitter followers:



> **Bill Alpert**
> @blalpert
>
> What I Missed, by Not Practicing Law:
> The Lawyer at the Center of SEC Pump-and-Dump Case
> barrons.com/articles/the-l… via @BarronsOnline

[https://twitter.com/blalpert/status/1047911867706957825].  The Barrons Article was viewed and tweeted (published) thousands more times by third parties.  For instance, John Lothian, CEO of John J. Lothian & Co., publisher of http://johnlothiannews.com/, tweeted the Barrons Article to his 9,229 followers as follows:

3



[https://twitter.com/JohnLothian/status/1047914954714701825].   Others followed suit, *e.g.*:

> https://twitter.com/Guruleaks1/status/1047916142726205442 (GuruLeaks);
>
> https://twitter.com/YoungPuggaroni/status/1047909098593947648 (SmartMoneyPug).

8.     Buhl describes what she does as "Smashmouth Investigative Journalism".[2] She has been out to get Kesner for several years.  She republished the Barrons Article. https://www.teribuhl.com/2019/04/11/hudson-bay-capital-tied-to-barry-honig-pump-and-dump-ring-mabvax-mbvx/ ("Bill Alpert of Barron's wrote a well read and detailed story about the lawsuit called "*The Lawyer at the Center of the SEC Pump and Dump Case*"")].   Between 2018 and the present, Buhl has targeted Kesner in a barrage of repeated defamation, both on her website, http://www.teribuhl.com/ and via her Twitter

---

[2]     "Smashmouth" means "characterized by brute force without finesse". [https://www.merriam-webster.com/dictionary/smashmouth].

account, https://twitter.com/buhlreports (@buhlreports).[3]  On September 5, 2018, Buhl

falsely stated in a blog on her website that the removal of Kesner's name from law firm

Sichenzia Ross Ference "could signal an SEC charge or settlement coming in the near

future".  Buhl also falsely implied that Kesner moved to Florida because of "judgments

or government fines" or with the expectation of receiving an "SEC fine".  Buhl further

insinuated that Kesner was involved in the sale of unregistered securities.  She blogged

the following: "I believe there could be issues of unregistered shares being sold or

restricted shares being released when they should be held in restriction.  It's hard to get

restricted stock to the DTC for free trading unless you have a friendly transfer agent not

doing due diligence on if the shares are legal to trade in the first place."

[http://www.teribuhl.com/2018/08/29/kesners-out-why-is-barry-honigs-securities-lawyer-

retiring/; https://twitter.com/ClarityToast/status/1034879799691489284].  On October 31,

2018, after publication of the Barron's Article, Buhl published the following false

statements about Kesner in a blog on her website:

> "His [Barry Honig's] crew of alleged bad actors – Team Honig – has been
> chronicled for years here at *TERIBUHL.com* and by Chris Carey at *Sharesleuth*
> and Bill Albert at *Barron's*.  It consists of biotech billionaire and philanthropist
> Philip Frost, his fellow co-investing partners Michael Brauser/John
> O'Rourke/Marc Groussman, John Ford – the promoter who wrote favorable
> analysis on stocks, priming them for the 'pump' of Honig's 'pump and dump' –
> and Harvey Kesner, a deal lawyer from SIRF LLP linked to a number of Honig's
> investments."

[https://www.teribuhl.com/2018/10/31/honig-deals-lead-to-finra-investigation-of-laidlaw-

co/].  On March 26, 2019, Buhl falsely published in a blog on her website that Kesner

---

[3]     Buhl operates a second Twitter account, @tbuhl.  This account's tweets
are protected.  Upon information and belief, Buhl repeated her false and defamatory
statements to the 1,642 followers of @tbuhl.

was "pushed out of his law firm as a named partner last year".  She labeled Kesner a "bad

actor".  [http://www.teribuhl.com/2019/03/26/honigs-puppet-ceo-elliot-maza-settles-with-

the-sec/].  On March 27, 2019, Buhl falsely accused Kesner of engaging in "illegal back

room deals and intimidation" of "BioZone":



[https://twitter.com/buhlreports/status/1110899384504467457 (tweeted by ScamPumpers

on  March  27,  2019)  https://twitter.com/ScamPumpers/status/1111011499735162880)].

On April 11, 2019, Buhl repeated the misrepresentation that "attorney Kesner was removed from the New York Law firm that bore his name Sichenzia, Ross, Ference, Kesner LLP". Buhl further insinuated that Kesner was part of "Team Honig" – a pump-and-dump "ring" – and that Kesner had engaged in wrongdoing for which he could be disbarred. She falsely stated that "Kesner has disappeared from the microcap stock scene since the SEC brought their enforcement action but has not been bared [sic] as an attorney. It's unclear if he is a confidential informant for the government or if charges will be brought against him in the future." [http://www.teribuhl.com/2019/04/11/hudson-bay-capital-tied-to-barry-honig-pump-and-dump-ring-mabvax-mbvx/]. At the time she published her various false and defamatory blogs, Buhl had no evidence and no good faith basis for her scandalous and sensational statements about Kesner.

9.      In order to fund her "Smashmouth" character assassinations, Buhl actively solicits donations from her readers via PayPal and via debit card and credit card. A link on Buhl's website allows her readers/subscribers to "Donate with PayPal". https://www.paypal.com/donate/?token=Svu1TWTEPhwQJKAXy4nJCuWa9gFMWZUcvZ82y3dPO6D9oi7Gn46br0bNVGW-qd-dmJbH30&country.x=US&locale.x=US]. Some of the news reports on Buhl's website are paid for via crowdfunding at www.piratemyfilm.com. Upon information and belief, Buhl has hundreds of readers/subscribers in Florida and earns substantial income from her publication of false and defamatory statements about Floridians, including Kesner.

10.      Buhl solicits anonymous "tips". https://www.teribuhl.com/about/ ("Anonymous tips can be sent to teribuhl@gmail.com"). Upon information and belief,

the unreliable sources (if any) employed by Buhl to defame Kesner were located in Florida.

11.     "The right of a man to the protection of his own reputation from unjustified invasion and wrongful hurt reflects no more than our basic concept of the essential dignity and worth of every human being—a concept at the root of any decent system of ordered liberty". *Rosenblatt v. Baer*, 383 U.S. 75, 92-93 (1966).  This is not a case about the First Amendment, or "freedom" of the press, or the quality of Barrons and Alpert's reporting on the "SEC Pump-and-Dump Case" – for no man or woman has the right to defame and disparage another.[4]  Rather, this is a case about intentional misconduct, actual malice and reckless disregard for the truth.

## II.  <u>PARTIES</u>

12.     Plaintiff is a citizen of Florida.  He lives with his family in Fort Lauderdale.  He is 61 years-old.  He is a private individual.  Kesner graduated from the State University of New York (Binghamton) in 1979 with a Bachelor of Science in management.  He obtained his Juris Doctorate from American University, Washington College of Law, in 1982, and a Master's Degree in Business Administration-Finance from American University in Washington, D.C. in 1984.  Kesner has served as a director and officer of many corporations.  He is a member of the Bar of the State of New York and is licensed to practice before all State and Federal Courts in New York.  Kesner began his long career as an attorney/examiner for the United States Securities and Exchange Commission ("SEC").  Kesner reviewed registrations, filings and reports under

---

[4]     The Supreme Court of the United States has recognized "[t]ime and again" that "false factual statements possess no First Amendment value." *United States v. Alvarez*, 132 S.Ct. 2537, 2560 (2012).  Thus, any attempt by Barrons, Alpert and Buhl to hide behind the "First Amendment" is unavailing.

the federal securities laws, public offerings, mergers, proxy solicitations and contests primarily in high technology, manufacturing and insurance industries. He prepared agency responses to no-action letters and interpretive requests on securities law regulatory issues. He also participated in enforcement referrals and investigations for violations of regulatory, compliance and reporting obligations. Between 1982 and 2018, Kesner built an extremely successful practice as an attorney representing clients in securities matters. Kesner was a partner in the New York law firm, Sichenzia Ross Ference Kesner, which consistently ranked as one of the top law firms in the nation for issuer, investor and private placement-agent legal counsel. Kesner's practice focused on finance, mergers and acquisitions, and public company representation. He has extensive experience in financing and counseling late-stage private companies transitioning to public company status through initial public offerings and alternative public offerings. Kesner's expertise includes counseling already public companies in SEC filings, compliance (including Sarbanes Oxley) and regulatory reporting, registered public offerings, private offerings, PIPEs, venture capital, leveraged buy-outs, restructurings, workouts, and day-to-day operational and regulatory issues. He served as an Arbitrator for the New York Stock Exchange ("NYSE") and the Financial Industry Regulatory Authority ("FINRA") in numerous securities and employee disputes. He was a frequent speaker on legal developments and evolving financial products and markets. Kesner enjoyed an untarnished personal and professional reputation in the community in which he lived and worked, with clients, with professionals at his firm, with colleagues in the law and the securities industry, and with his many friends.

13.     It took Kesner a life-time to earn his reputation and standing.  It took the Defendants but a moment to destroy Kesner.   As was known and intended, the Defendants' defamation spread like wildfire throughout the Internet and social media, causing Kesner to be ostracized, causing enormous loss of clients, loss of business, loss of long-time friendships, and causing Kesner actual damages, including insult, pain, embarrassment, humiliation, mental suffering and permanent and irreversible injury to his reputation.

14.     Defendant, Barrons, is a Massachusetts corporation, headquartered in Boston.  Barrons operates as a subsidiary of Dow Jones & Company, Inc., whose parent is News Corporation (NASDAQ:NWS, NWSA).  Barrons publishes a weekly investment magazine for senior executives, institutional investors, individual investors, and financial professionals worldwide.  Barrons operates www.barrons.com, the website on which the Barron's Article was originally published and remains available for viewing.

15.     Defendant, Alpert, is a citizen of New Jersey.  He has been employed by Barrons as a writer and editor since 1984. [https://www.barrons.com/authors/8520]. Alpert is an attorney. [https://sites.google.com/view/billalpertjournalist/curriculum-vitae]. At all times relevant to this action, Alpert was acting within the scope of his duties as an employee of Barrons, and during the course of his employment.  Alpert pitched the idea of the Barrons Article to his editors/publishers at Barrons.  Prior to publication on October 4, 2018, Barrons' editors and publishers reviewed and approved the Barron's Article, ratifying the false and defamatory statements made by Alpert.

16.     Barrons reach and engagement is enormous.  In July 2018, approximately 510,000 people subscribed to Barron's print magazine and digital-only media.

[https://www.statista.com/statistics/691894/barrons-paid-circulation/].  Upon information and belief, Barrons sells hundreds of its weekly magazines to professionals in Florida and has hundreds of subscribers in Florida.

17.     Defendant, Buhl, upon information and belief, is a citizen of New York. Buhl's twitter profile confirms that she tweets, retweets, replies and likes from "everywhere" in the United States.  Buhl's blogs and tweets at issue in this case were knowingly and intentionally directed to Kesner in Florida.

### III.  JURISDICTION AND VENUE

18.     The United States District Court for the Southern District of Florida has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 (Diversity Jurisdiction) and 28 U.S.C. § 1367 (Supplemental Jurisdiction).  The parties are citizens of different States and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest, costs and fees.

19.     The Defendants are subject to general and specific personal jurisdiction in Florida.  They transact substantial business in Florida and committed multiple acts of defamation and intentional torts, in whole or part, in Florida.  They have minimum contacts with Florida such that the exercise of personal jurisdiction over them comports with traditional notions of fair play and substantial justice and is consistent with the Due Process clause of the United States Constitution.   Defendants' defamation was purposefully directed at Florida and was continuous and systematic.  Kesner's claims directly arise from and relate to Defendants' publication of false and defamatory statements in Florida. *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770 (1984) and *Calder v. Jones*, 465 U.S. 783 (1984)); *see Internet Solutions Corp. v. Marshall*, 39 So. 3d 1201,

1214-1216 (Fla. 2010) (holding a nonresident defendant commits a tortious act in Florida by virtue of posting defamatory statements about a Florida resident on a website accessed in Florida).

20.     Venue is proper in the Fort Lauderdale Division of the United States District Court for the Southern District of Florida because Defendants published and republished defamatory statements to a wide audience that includes securities attorneys and other persons who reside within the Fort Lauderdale Division.  Defendants caused substantial harm to Kesner's personal and professional reputations in Florida.   A substantial part of the events giving rise to the claims stated in this action occurred in the Southern District of Florida.

## IV.  STATEMENT OF ADDITONAL MATERIAL FACTS

21.     On September 7, 2018, after a thorough, multi-year investigation, the SEC filed a civil enforcement action in the United States District Court for the Southern District of New York (the "SEC Action").  Most of the defendants in the SEC Action reside in Florida.  The SEC's complaint alleged as follows:

> 1.       This case involves three highly profitable "pump-and-dump" schemes perpetrated by Honig, Stetson, Brauser, O'Rourke, Groussman, and Frost, and their entities GRQ, SCI, Grander, HSCI, Melechdavid, ATG, Opko, FGIT, and Southern Biotech from 2013 through 2018 in the stock of three public companies (Company A, Company B, and Company C) that, while enriching Defendants by millions of dollars, left retail investors holding virtually worthless shares.

22.     The SEC did not bring any charges against Kesner.

23.     The SEC did not name Kesner as a relief defendant.[5]

24.     The SEC did not otherwise suggest in any way that Kesner had engaged in any wrongdoing.

25.     Prior to October 4, 2018, there was no information – not a scintilla of evidence – anywhere from which anyone could conclude or infer that any department or agency of the United States believed that Kesner had engaged in any wrongdoing in the case.

26.     Prior to publishing the false and defamatory statements at issue in this action, the Defendants reviewed the SEC's complaint.  Based upon this review, the Defendants knew that the accusations they levelled against Kesner were false.  At the very least, in light of the allegations in the SEC complaint, the Defendants acted with reckless disregard for the truth.

27.     On September 10, 2018, Barrons and Alpert published an article entitled, "**SEC Charges Against Phillip Frost Might Just Be the Tip of the Iceberg**".  [https://www.barrons.com/articles/sec-charges-phillip-frost-1536608366].  In this article, Barrons and Alpert reported on the SEC Action.  The article makes no mention of Kesner.

28.     On April 11, 2019, Kesner, pursuant to Fla Stat. § 770.01, served notice on Barrons and Alpert, specifying the article and statements therein which Kesner alleges to be defamatory.  A true copy of Kesner's letter is attached as *Exhibit "A"*.

_____

[5]     In the context of an SEC enforcement action, a relief defendant "is a person who holds the subject matter of the litigation in a subordinate or possessory capacity as to which there is no dispute." *SEC v. Cherif*, 933 F.2d 403, 414 (7th Cir. 1991).  Accordingly, a relief defendant is not a real party in interest and "can be joined to aid the recovery of relief without the assertion of subject matter jurisdiction" because he or she "has no ownership interest in the property which is the subject of litigation." *Id.*

29.     On May 13, 2019, Kesner, pursuant to Fla Stat. § 770.01, served notice on Buhl, specifying the statements on Buhl's website and Twitter feed which Kesner alleges to be defamatory.  A true copy of Kesner's letter is attached hereto as _Exhibit "B"_.

30.     The Defendants' false and defamatory statements were not published in good faith; the falsity was not due to an honest mistake of the facts; and there were no reasonable grounds for believing that the statements about Kesner were true.  In spite of Kesner's request for a retraction and apology, the Defendants refused to make and issue a full and fair correction, apology, or retraction.   Defendants' defamatory statements remain on the Internet to this very day.

## COUNT I – <u>DEFAMATION</u>

31.     Plaintiff restates paragraphs 1 through 30 of this Complaint and incorporates them herein by reference.

32.     Barrons, Alpert and Buhl made and published to third-parties, including subscribers, viewers, listeners, followers, mainstream media, and print media, numerous false factual statements, which are detailed verbatim above, of or concerning Kesner. The conduct attributed to Kesner by Barrons, Alpert and Buhl is completely incompatible with the proper exercise of Kesner's lawful business, trade, profession or office as an attorney.  Barrons, Alpert and Buhl defamed Kesner directly or by implication.

33.     By publishing the Barrons Article and Buhl's blogs on the Internet and by tweeting the false statements, Barrons, Alpert and Buhl each knew or should have known that their false and defamatory statements would be republished over and over and over by third-parties millions of times to Kesner's detriment and injury.   Republication by mainstream media, print media and on social media was the natural and probable

consequence of Barrons, Alpert and Buhl's actions and was actually and/or presumptively authorized by Barrons, Alpert and Buhl.  In addition to their original publications, Barrons, Alpert and Buhl are liable for the millions upon millions of republications of the false and defamatory statements by third-parties.

34.     Barrons, Alpert and Buhl's false statements constitute defamation *per se* or defamation *per quod*.  The statements accuse and impute to Kesner the commission of crimes involving moral turpitude (securities fraud) and for which Kesner may be punished and imprisoned in a state or federal institution.  The statements impute to Kesner an unfitness to perform the duties of an office or employment for profit, or the want of integrity in the discharge of the duties of such office or employment, and tend to subject Kesner to hatred, distrust, ridicule, contempt, or disgrace.  Barrons, Alpert and Buhl's statements also prejudice Kesner in his profession as a securities attorney in the eyes of a substantial and respectable minority of the community.

35.     Barrons, Alpert and Buhl false and defamatory statements caused Kesner to suffer and incur both presumed and actual damages, including loss and injury to his business, insult, pain, embarrassment, humiliation, mental suffering, harm to Kesner's name and reputation, out-of-pocket loss, and other actual damages.

36.     Barrons, Alpert and Buhl acted with actual malice and reckless disregard for the truth for the following reasons:

        a.      Barrons and Alpert violated their own Code of Conduct [https://www.dowjones.com/code-conduct/] and Barrons, Alpert and Buhl abandoned all journalistic standards in writing, editing and publishing the Barrons Article and the blogs at issue.

b.      Barrons, Alpert and Buhl conceived a story line in advance of any investigation and then consciously set out to manufacture evidence to conform to the preconceived story.  Barrons, Alpert and Buhl pursued and regurgitated a preconceived narrative that they knew to be false.  Kesner was not part of "Team Honig" and was not involved in an "pump-and-dump schemes".

c.      Barrons and Alpert relied on sources, including Buhl, that Barrons and Alpert knew to be wholly unreliable.  Based on information known and available to Barrons, Alpert and Buhl, including the SEC complaint and information on Buhl's website, Barrons, Alpert and Buhl in fact harbored serious doubt as to the veracity of their statements about Kesner.  Indeed, the statements were knowingly false, with not a shred of supporting evidence, and the Defendants knew that before they wrote the articles and blogs in question.

d.      Barrons, Alpert and Buhl were in possession of information that demonstrated the falsity of their statements.  They consciously and intentionally ignored known and available contradictory evidence that demonstrated the preconceived thesis about Kesner was false.  Barrons, Alpert and Buhl deliberately failed to investigate sources of information (*e.g., the SEC*) that contradicted the preconceived storyline.

e.      Barrons, Alpert and Buhl knowingly presented half-truths wrapped in misstatements and conjecture.  They intentionally omitted material facts and repeated words knowing that the words were false or inherently improbable and at a time when there were obvious reasons to doubt the veracity and credibility of their statements.  Overall, Defendants intentionally painted a grossly inaccurate picture of Kesner.  As Kesner pointed out in his demand letter to Barrons and Alpert:

With respect to specific statements in the Stories, Barron's has defamed our client, made false representations in furtherance of questionable motivations by its reporter and painted a grossly inaccurate picture or our client.  The details of hiring by MabVax are false.  The involvement of our client in any "pump-and-dump" activities is false.  The graphic depiction of our client with a false caption and insertion into a Story related to claims of wrongdoing is false.  The title of Barron's article proclaiming our client is the "center" of the universe described in SEC charges is false.  Virtually nothing said about our client, the  SEC investigation or the MabVax litigation is accurate.

[*Exhibit "A", p. 6*].

f.      Barrons, Alpert and Buhl were out to get anyone who they believed was part of "Team Honig", especially Kesner.  They exhibited a singular focus and strong motive to lie about Kesner, and a motive to fabricate the charges securities fraud.  The Barrons Article and the Buhl blogs were the product of the Defendants' extreme bias, ill-will and desire to publish a salacious story about Kesner – one of many attorneys who had at times represented parties involved with companies involved or defendants named in the SEC Action.

g.      Barrons, Alpert and Buhl chose to manufacture and publish false statements about Kesner and use unnecessarily strong and violent language, disproportionate to the occasion, when they knew there was no evidentiary basis for the statements.  Barrons, Alpert and Buhl did not act in good faith because, in the total absence of evidence, they could not have had an honest belief in the truth of their statements about Kesner.

h.      Barrons, Alpert and Buhl reiterated, repeated and continued to publish the false defamatory statements out of a desire to gain notoriety, generate revenues and profits for themselves, and hurt Kesner.

i.      Barrons, Alpert and Buhl initiated the defamation, going out of their way to publish extra-judicial statements about Kesner.

37.     Barrons, Alpert and Buhl lacked reasonable grounds for any belief in the truth of their statements and acted negligently in failing to determine the true facts.

38.     As a direct result of the Defendants' defamation, Kesner suffered substantial presumed and actual damages and loss, including, but not limited to, pain and suffering, emotional distress and trauma, insult, anguish, stress and anxiety, public ridicule, humiliation, embarrassment, indignity, damage and injury to his personal and professional reputations, loss of business and income, attorney's fees, costs, and other out-of-pocket expenses in the amount of $20,000,000.00 or such other amount as is determined by the Jury.

## COUNT II – COMMERCIAL DISPARAGEMENT

39.     Plaintiff restates paragraphs 1 through 38 of this Complaint and incorporates them herein by reference.

40.     Barrons, Alpert and Buhl published and disseminated widespread false and disparaging information about Kesner, which is detailed verbatim above.

41.     Barrons, Alpert and Buhl knew their statements were false and acted with the specific intent to call into question the quality of Kesner's legal advice and services and to injure Kesner in his business as a securities attorney.  Barrons, Alpert and Buhl knew or reasonably should have known that their published statements would likely result in inducing others, especially those in the securities industry, not to deal with the Kesner.

42.     None of Barrons, Alpert's or Buhl's statements are privileged.  Barrons, Alpert and Buhl had no right to publish false and disparaging information about Kesner. They knew of the falsity of their statements and acted with wanton, intentional and

reckless disregard concerning publication. Barrons, Alpert and Buhl acted with ill-will and they intended to interfere with the economic interests of Kesner, including Kesner's law practice, in an unprivileged fashion.

43.     Barrons, Alpert and Buhl's statements and actions constitute commercial/business disparagement under Florida law.

44.     Barrons, Alpert and Buhl's commercial disparagement caused Kesner to suffer and incur special damages, including loss of income and clients and out-of-pocket expenses in the amount of $20,000,000.00 or such other amount as is determined by the Jury.

## COUNT III – DECEPTIVE AND UNFAIR TRADE PRACTICES

45.     Plaintiff restates paragraphs 1 through 44 of this Complaint and incorporates them herein by reference.

46.     Barrons, Alpert and Buhl publication, republication and widespread dissemination of falsehoods about Kesner constitutes unconscionable acts or practices and unfair or deceptive acts or practices in the conduct of a trade or commerce. Barrons, Alpert and Buhl's actions violate Fla. Stat. § 501.204 and are unlawful.

47.     Barrons, Alpert and Buhl willfully used methods, acts, or practices declared unlawful under Fla. Stat. § 501.204.

48.     Kesner suffered a loss as a result of acts or practices that violate Fla. Stat. § 501.204.

49.     Kesner brings this action against Barrons, Alpert and Buhl pursuant to Fla. Stat. 501-211 to recover to actual damages, plus attorney's fees and court costs, in the amount of $20,000,000.00 or such other amount as is determined by the Jury.

## COUNT IV – <u>TORTIOUS INTERFERENCE</u>

50.     Plaintiff restates paragraphs 1 through 49 of this Complaint and incorporates them herein by reference.

51.     At the time Barrons, Alpert and Buhl published their false and defamatory statements, Kesner had valid and enforceable contracts and existing business expectancies in his relationships with clients.  Kesner had a reasonable expectation of earning substantial income from those business relationships.

52.     Barrons, Alpert and Buhl knew about Kesner's law practice, contracts and business expectancies.

53.     Barrons, Alpert and Buhl intentionally interfered with Kesner's property rights and business expectancies by, *inter alia*, devising, aiding, abetting and actively participating in the scheme to defame and injure Kesner, by intentionally lying in the Barrons Article and Buhl's blogs, and by fabricating claims about Kesner.  Barrons, Alpert and Buhl's improper methods, actions and practices were, *inter alia*, defamatory, unethical, oppressive, over-reaching, fraudulent, hostile, and sharp.  Barrons, Alpert and Buhl's interfere was completely unjustified.

54.     As a direct result of Barrons, Alpert and Buhl's tortious interference with Kesner's contracts and business expectancies, Kesner suffered damage and incurred loss, including, without limitation, injury to his business, loss of clients, damage to his reputation, prestige and standing, attorney's fees, court costs, and other damages in the amount of $20,000,000.00 or such other amount as is determined by the Jury.

Kesner alleges the foregoing based upon personal knowledge, public statements of others, and records in his possession.   Kesner believes that substantial additional evidentiary support, which is in the exclusive possession of Barrons, Alpert and Buhl, their sources (if any), and their agents and other third-parties, will exist for the allegations and claims set forth above after a reasonable opportunity for discovery.

Kesner reserves the right to amend this Complaint upon discovery of additional instances of the Defendants' defamation and wrongdoing.

## CONCLUSION AND REQUEST FOR RELIEF

WHEREFORE, Harvey J. Kesner respectfully requests the Court to enter Judgment against Barrons, Alpert and Buhl, jointly and severally, as follows:

A.      Compensatory damages in the amount of $20,000,000.00;

B.      Punitive damages in the amount of $5,000,000.00 as a result of the Defendants' specific intent to harm Kesner and the actual harm inflicted on Kesner;

C.      Prejudgment interest on the principal sum awarded to Plaintiff by the Jury from October 4, 2018 to the date of Judgment at the maximum rate allowed by law;

D.      Postjudgment interest at the maximum rate allowed by Florida law;

E.      Costs and such other relief as is just and proper.

## TRIAL BY JURY IS DEMANDED

DATED:      May 31, 2019

HARVEY J. KESNER

By:   */s/ Robert C. Buschel*
          Robert C. Buschel, Esq.
          Florida Bar No. 0063436
          BUSCHEL GIBBONS, P.A.
          One Financial Plaza
          100 S.E. Third Avenue, Suite 1300
          Fort Lauderdale, Florida 33394
          Tele: (954) 530-5301
          **Buschel@BGlaw-pa.com**

          *Counsel for the Plaintiff*

          Steven S. Biss (VSB # 32972)
          300 West Main Street, Suite 102
          Charlottesville, Virginia 22903
          Telephone:      (804) 501-8272
          Facsimile:       (202) 318-4098
          Email:          **stevenbiss@earthlink.net**

          *Counsel for the Plaintiff*
          *(Application for Admission Pro Hac Vice*
                *To be Filed)*